[No. D059463. Fourth Dist., Div. One. Dec. 27, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EDWARD SPENCE, Defendant and Appellant.

## COUNSEL

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—A jury convicted James Edward Spence of two counts of sexual offenses against a child 10 years old or younger (his housemate's daughter D.), occurring on April 20, 2009 (Pen. Code, § 288.7, subds. (b) [count 1, sexual penetration] & (a) [count 2, sodomy]; all further statutory references are to the Penal Code unless noted). The jury also convicted him of two counts of sexual activity with D. occurring in March 2009 (§§ 288, subd. (a) [count 4, committing a lewd act], 288.7, subd. (b) [count 5, oral copulation].) He was acquitted of two other charges and an additional count was dismissed on the People's motion.

Spence was sentenced to a total term of 55 years to life. He appeals, first contending the trial court erred in permitting the prosecutor to rebut the opinions of the defense expert witness, a psychologist who testified about Spence's educational level and writing ability, by presenting the jury with statements Spence previously made in his testimony at a pretrial hearing on his motion to suppress evidence, concerning whether he had the ability to express himself in writing (such as in letters found in his pocket when he turned himself in for arrest). (*James v. Illinois* (1990) 493 U.S. 307 [107 L.Ed.2d 676, 110 S.Ct. 648] (*James*) [precluding use of illegally obtained custodial statements to impeach "all" defense witnesses]; § 1538.5.) This is a question of first impression about the allowable scope of impeachment of a defense expert witness's opinion that is based in part upon statements by the defendant, through the use of the defendant's suppression hearing testimony. We conclude the rules and policies expressed in *James* are not implicated by the procedures used here, and there was no error.

Spence also challenges the ruling of the trial court allowing a different expert witness, the interviewing pediatrician who specialized in child abuse treatment, to be questioned about her opinion about the truth of the charges, albeit in a somewhat hypothetical manner. Although this is a close question, any evidentiary or other error that occurred was harmless.

In another question of first impression, Spence argues he was deprived of due process of law at trial when the trial court misapplied statutory provisions concerning certain sex offense prosecutions that allow one support person to accompany the child witness to the stand. (§§ 868.5, 868.8; Evid. Code, § 765.) Spence argues the court erred by additionally allowing a therapy dog or support canine to be present at the child's feet while she testified, and contends this was "overkill" that unduly focused the jury upon the child's alleged status as a victim, before any conviction was achieved. He complains the necessary statutory findings were not made, and the necessary admonitions were not given to properly educate this victim advocate and the jury

about the appropriate demeanor restrictions in testimony. (§§ 868.5, 868.8.) We find no prejudicial error or abuse of discretion in these respects.

In a further statutory argument, Spence contends the terms of section 288.7, supporting his three convictions for molesting a child "10 years or younger," are ambiguous and were misconstrued by the trial court, because this child victim had passed her 10th birthday at the time of the charged offenses, although she was not yet 11 years old. The California Supreme Court recently resolved this issue in *People v. Cornett* (2012) 53 Cal.4th 1261 [139 Cal.Rptr.3d 837, 274 P.3d 456] (*Cornett*), finding the statute was not ambiguous, and this identical claim consequently fails.

Having reviewed all of Spence's arguments as they are applied to this record, we find no reversible error and affirm the judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

Spence's challenges to his convictions do not include any claims of insufficiency of the evidence. The basic underlying facts follow and will later be expanded upon, as we evaluate his constitutional and statutory arguments.

### A. Background

When these incidents occurred in 2009, Spence was about 25 years old and had been living for about 10 years as a housemate to D.'s mother, D. Smith (Ms. Smith), who was older and had four children, two with Spence. Spence acted as the stepfather to D., who was born in 1998 and whose father did not live with the family. Due to various problems with one of the other children in the home, the family had a child protective services (CPS) caseworker, Melinda Pellegrino. Ms. Smith wanted to break up with Spence and have him move out and leave the family, but he did not want to do so. The night of April 20, Spence and his male friend Dale Williams were at Ms. Smith's house overnight, and she was out with friends.

On the morning of April 21, 2009, D. told Ms. Smith that while Ms. Smith had been absent the night before, her dad (which is what she called Spence) "raped her," by telling her to come into the bathroom and pull down her pants, and putting his finger in her vagina. Ms. Smith drove her son to school, discussed the matter further with D., and then woke Spence to have him go to a Kaiser clinic with them. Spence said it was not true. At Kaiser, D. was seen by a male nurse, Matthew Sager, and she was crying and upset while telling him her "dad" had pulled her pants down and touched her private parts. She said something similar had happened a month ago.

Nurse Sager told Ms. Smith that Kaiser's policy was to send such patients to Rady Children's Hospital. Ms. Smith became angry and left with D., so the nurse called 911 and police followed their car. When Ms. Smith got home, she called her CPS caseworker, Pellegrino, and they talked to D. about what had happened. Pellegrino told Ms. Smith and D. they should cooperate with police officers, who had arrived at the Smith home. Spence called home and Pellegrino told him he needed to come home, but he did not do so.

D. was taken to Rady Children's Hospital, where she did not want to speak to a caseworker, but agreed to speak with Dr. Lorena Vivanco, a board certified pediatrician specializing in child abuse treatment. While crying and upset, D. told Dr. Vivanco that the night before, her dad Spence took her into the bathroom and pulled down her pants, and then started touching her "privacy" and put his fingers inside her privacy. Then he put his privacy inside her "butt" after turning her over and putting something slippery on his own privacy. The month before, while D. was asleep, Spence came to her bed and tried to put his "privacy" into her mouth, after putting his finger in it first. D. told Dr. Vivanco that she had not told anyone about the first incident because she did not think it would happen again and Spence told her not to tell.

While D. was being examined by Dr. Vivanco, Detective Dana Hoover was at the hospital talking to Ms. Smith. Spence called Ms. Smith and said that he wanted to talk to the detective to clear things up. Detective Hoover asked him to call her the next day, which he did, and she made arrangements for him to come to the police station for an interview on the following day.

## B. Interview, Arrest and Charges

Spence went to the police station on April 22, was escorted upstairs and interviewed by plainclothes Detective Hoover and Detective Cindy Brady. Although he originally said he had not sexually touched D. and offered to take a polygraph examination to clear himself, the detectives learned that the equipment was out of order and nothing happened.[1]

Eventually, Spence admitted to the detectives he had molested D. in April, but not in March. The detectives asked him if he wanted to apologize to D., and he said he could not write and did not know how to begin, so Detective Hoover offered to take down his dictation, wrote down what he said, and kept the original (the dictated letter). Hoover and the other detective then told him to go take care of his affairs and to turn himself in for arrest in a few days, because that would look better for him and for the family.

---

[1] At trial, the parties stipulated that all references to the polygraph exam idea must be redacted.

On April 28, 2009, Spence came to the police station to turn himself in for arrest. Two handwritten, signed letters about his remorse and sadness regarding the incidents, dated April 27, 2009, and addressed to D. and Ms. Smith, were found in his pocket. Detective Hoover made copies of these (here, designated the two copied letters) and returned the originals to him. Charges were filed April 30, 2009.[2]

On July 7, 2010, the San Diego County District Attorney filed an amended information alleging three counts against Spence arising out of the April 20, 2009 incident with D. (sexual penetration by putting his finger in her vagina, sodomy and sexual intercourse, all with a child 10 years old or younger; § 288.7, subds. (a), (b)). As to the March 2009 incident, two counts were charged (committing a lewd act upon a child by putting his finger in the child's mouth before inserting his penis, and oral copulation with a child 10 years old or younger; §§ 288, subd. (a), 288.7, subd. (b)).[3]

In preparation for his defense at trial, Spence was interviewed by an expert psychologist, Dr. Carroll Waymon, to evaluate his educational level and his ability to make decisions when confronted with female authority figures, such as the detectives. Dr. Waymon reviewed Spence's continuation school records and talked to him for about two and one-half hours, and evaluated him as having a grade level of about third through fifth grade. He determined that Spence has dyslexia, which affects his general functioning abilities and makes him dependent on others, rather than being able to make his own independent judgments.

### C. Suppression Hearing and Trial Cases-in-chief

At the outset of trial, Spence brought a motion to suppress his statements at the April 22 interview with the detectives, contending it was a custodial interrogation and his unwarned statements were not voluntary. (§ 1538.5.) At the suppression hearing, Detective Hoover testified about writing the dictated letter at Spence's request, when he told her he could not write or read well.

Spence testified that he only agreed to let Detective Hoover write the dictated letter for him because he thought that was what she wanted to hear him say. When the prosecutor presented him with the two copied letters (as

---

[2] Detective Hoover testified in rebuttal that Spence told her he wrote the two copied letters (those found in his pocket when he was arrested).

[3] Two other counts were charged stemming from the March incident but no convictions were obtained on them (count 6, sexual penetration with a child 10 years old or younger [§ 288.7, subd. (b) (finger in the child's vagina)]; and count 7, engaging in sodomy with a child 10 years old or younger [§ 288.7, subd. (a) (penis in the child's anus)]). Count 3, regarding sexual intercourse, was eventually dismissed.

found in his pocket when he was taken into custody) and asked him if he wrote them, Spence said the signature and handwriting looked like his own and he guessed he must have written them.

The court denied Spence's motion to suppress his statements to detectives, ruling that he was not in custody at the time and the statements were voluntary. No ruling on admissibility on any letters was made at that time.

At trial, D. testified in the prosecution's case-in-chief and was accompanied to the witness stand by a victim advocate from the district attorney's office, as well as a therapy dog that sat at her feet and behind the stand. Defense objections, that this level of support was unnecessary and excessive under the statutory scheme, were overruled. (See pt. IV, *post.*)

Other percipient and expert witnesses testified at trial, including Ms. Smith and Pellegrino. Detective Hoover testified and played for the jury a tape of the April 22 interview, and displayed an enlargement of the dictated letter.

Laboratory tests on D.'s clothing and her person (mouth, genital and anal areas) showed there were traces of sperm cells on the mouth and clothing but no seminal fluid. Not enough material was collected for a complete DNA analysis, but neither Spence nor his friend Williams, who was at the house that night, could be excluded as an African-American sperm cell donor of the cells on the clothing.

Dr. Vivanco testified about her forensic examination of D., which showed physical evidence of bruising and spotting in the vaginal area and hymen. Dr. Vivanco concluded there was definite evidence of some sexual abuse or contact. Although there was no visible indication of anal penetration, the doctor stated she could not rule out that it happened, since a child's anus may stretch under such duress.

The prosecutor asked Dr. Vivanco about possible explanations for D.'s story. Specifically, she asked, "if someone by the name of [D.] says that she is sexually assaulted by someone by the name of James Spence, is there any evidence that you tested in this case that contradicts that story?" The expert replied that there were no test results excluding Spence, i.e., "[A]ll of the DNA that I have ends up having some consistency with the DNA test from Mr. Spence." (See pt. III, *post.*)

Spence did not testify at trial. His defense theories were that Ms. Smith had D. falsely accuse him of sexual assault to get rid of him, or that his mental deficiencies had led him to make a false confession. He also contended that the perpetrator might have been his friend Dale Williams, who

was at the house that night and who could have left the sperm cells found in the lab tests. Spence presented numerous character witnesses and several expert witnesses, to be described in the discussion portion of this opinion.

Briefly, with regard to the issue about Spence's ability to write letters, his expert psychologist, Dr. Waymon, testified about his evaluation of the apparent mental deficiencies and low level of functioning that Spence had, based in part upon a two-and-one-half-hour interview and his review of school records. Dr. Waymon stated he did not believe Spence had the ability to read or write at a normal adult level, based upon two unusual writing samples he had obtained from Spence during his interview (a sentence or two in tiny writing with eccentric spacing; they are not in the appellate record).

During cross-examination about his opinions, Dr. Waymon was shown the two copied letters obtained by detectives when Spence was arrested, and he opined that it was unlikely that Spence had written them, since the handwriting and printing in them were consistent with that of a high school graduate or adult, rather than with a low functioning individual such as Spence.

### D. Rebuttal Phase of Prosecution; Instructions and Verdict; Motion and Judgment

In rebuttal testimony, Detective Hoover identified the copied letters and stated that at the time of his arrest, Spence told her he had written them. However, she never put that in a written report.

In response to Dr. Waymon's testimony, the prosecutor sought to rebut or impeach his expert opinion by bringing in other evidence that Spence had the ability to write and had done so, based on the copied letters found in his pocket when he was arrested. She proposed to read into the record Spence's testimony at the suppression hearing, in which he admitted that those signatures looked like his and he guessed he must have written them. Defense counsel unsuccessfully objected that Spence had had a right to testify at his suppression hearing, and his testimony about the letters at that hearing should not be used against him either in the case-in-chief or in rebuttal.

As will be discussed in further detail, the trial court explained that even statements taken in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*) can be used to impeach a testifying defendant's false statements. (See pt. II, *post*; *Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643].) The court reasoned that if a defense expert had presented a false or unreliable opinion, it was appropriate to allow the prosecution to attempt impeachment of it, as part of the truth-finding process of the court. The defense objections were overruled and

the prosecutor was allowed to read to the jury portions of Spence's testimony about the copied letters, as given at the suppression hearing. The dictated and copied letters were admitted into evidence at the close of the defense case and during rebuttal.

The jury received instructions about the limited purposes for which they could consider the evidence of the two copied letters: to determine Spence's writing level and ability. His oral statements before trial were to be considered along with all other evidence. Regarding his statements to the expert, they were to be used for evaluating the expert's opinion, not for the truth of their content. More generally, the jury was told, inter alia, that the fact a crime was charged is not evidence the charge is true (CALCRIM No. 220), and they must decide the case based on the evidence, not on any extrinsic factors such as sympathy, passion, or prejudice (CALCRIM No. 200).

The jury deliberated and found Spence guilty of counts 1, 2, 4 and 5, but acquitted him of two other counts stemming from the March incident. On the People's motion, the court dismissed count 3.

Spence brought a motion for new trial. His major argument was that Dr. Waymon's expert testimony had been unfairly impeached with suppression hearing testimony from Spence, contrary to the rules of *James, supra,* 493 U.S. 307, 317–319, which holds that illegally seized evidence can be used to impeach a defendant's own testimony, but not the testimony of other defense witnesses. The People responded that such impeachment was proper in this case, because Dr. Waymon was essentially offering an opinion based upon what defendant said, but what defendant said could be false and could be interpreted another way. (*Wilkes v. U.S.* (D.C. 1993) 631 A.2d 880, 889–891 (*Wilkes*).)

At the new trial hearing, the parties disputed at which point the copied or dictated letters had been admitted into evidence, and the People took the position that they had not needed to seek admission of the copied letters in their case-in-chief, because they were "self-serving." In its ruling, the court noted that had the People sought admission, it would have found the letters self-authenticated and ruled them admissible. (In any case, the letters were apparently admitted during the rebuttal phase of the proceedings.) The new trial motion was denied.

Spence was sentenced to a total term of 55 years, composed of a 25-year-to-life term for count 2 and consecutive 15-year terms for each of counts 1 and 5 (and an eight-year stayed sentence on count 4). He timely appealed.

## DISCUSSION

## I

## *INTRODUCTION TO ISSUES; "10 YEARS OF AGE OR YOUNGER" STATUTORY LANGUAGE*

Spence challenges his convictions by attacking the court's evidentiary and legal rulings at trial that (1) allowed the defense expert's opinion to be rebutted through a reading of Spence's own testimony, given at the pretrial suppression hearing, in which he admitted that he must have written and signed the two letters of apology (the copied letters) that were found in his pocket at his arrest and (2) allowed the prosecution's medical expert to give her opinion, on a given set of facts using Spence's name, about any other possible explanations of the results of the laboratory tests on D.'s clothing and person. As we will show, those rulings were within the bounds of applicable federal and state authorities. (*James, supra,* 493 U.S. 307; pt. II, *post*; *People v. Vang* (2011) 52 Cal.4th 1038 [132 Cal.Rptr.3d 373, 262 P.3d 581] (*Vang*); pt. III, *post*.)

Following our resolution of those questions, we will address Spence's arguments that the trial court erred or misinterpreted the statutory scheme of section 868 et seq., when it allowed D. to be accompanied to the witness stand by a victim advocate from the district attorney's office, and also by a therapy dog that sat at her feet, when section 868.5 et seq. expressly allow only one such person to be present for support during a vulnerable victim's testimony. As will be discussed, the record does not support Spence's claims that these procedures served to place any undue emphasis upon D.'s status as an alleged victim, nor show that any inappropriate appeals to the jury's sympathies or any statutory error were created by these circumstances. (Pt. IV, *post*.)

At the outset, we now dispose of Spence's claim the trial court erred in permitting trial to proceed on the charges involving a victim "10 years of age or younger," since D. was 10 years of age plus three or four months when the charged incidents occurred. (§ 288.7; counts 1, 2 & 5.) As both parties acknowledge, at the time these briefs were prepared, these same statutory interpretation issues were awaiting resolution in a case that was pending before our Supreme Court, *Cornett, supra,* 53 Cal.4th 1261. That opinion was issued April 30, 2012, holding that the proper interpretation of this same statutory phrase "is another means of saying 'under 11 years of age.'" (*Id.* at p. 1264.) We are bound by this authority, which resolves all the issues presented by this record, and nothing new has been presented to distinguish Spence's case from the issues resolved in *Cornett*. There was no error in this respect.

## II

### *ALLOWABLE IMPEACHMENT OF DEFENSE EXPERT'S OPINION*

The resolution of the issue regarding the use of a defendant's pretrial testimony at a suppression hearing for rebuttal of the opinion testimony of a defense expert witness, hinges on the proper interpretation of *James, supra*, 493 U.S. 307. In *James*, convictions were reversed for prejudicial error in the prosecutor's permitted use of the defendant's statements, obtained in violation of the Fourth Amendment, for impeachment of the testimony of a third party defense witness. The Supreme Court applied a balancing test, holding that "[o]ur previous recognition of an impeachment exception *limited to the testimony of defendants* reflects a careful weighing of the competing values. Because expanding the exception to encompass the testimony *of all defense witnesses* would not further the truth-seeking value with equal force but would appreciably undermine the deterrent effect of the exclusionary rule, we adhere to the line drawn in our previous cases." (*James, supra*, at p. 320, italics added.)

The exclusionary rule relied upon in *James, supra*, 493 U.S. 307 arises out of the policies that have been implemented for protection of a defendant's rights under the Fourth Amendment, principally accomplished by deterring unlawful police conduct. (See *Herring v. United States* (2009) 555 U.S. 135, 144 [172 L.Ed.2d 496, 129 S.Ct. 695] ["To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."]; see 4 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Illegally Obtained Evidence, § 14, pp. 753–755.)

The court in *James, supra*, 493 U.S. 307 dealt with the use of a statement of the defendant that had been unlawfully obtained, in violation of the Fourth Amendment. The Supreme Court rejected the prosecution's efforts to impeach a defense witness by using the defendant's unlawfully obtained statement, and viewed those efforts as an improper dilution of the exclusionary rule. The court reasoned the prosecution's theory of impeachment used in *James* would theoretically apply to *any defense* witness. As such, it would lessen the deterrent effect of the exclusionary rule and thus encourage police to disregard the mandates of the Fourth Amendment.

The case before us does not present the policy concerns which guided the *James* opinion. (*James, supra*, 493 U.S. 307.) Spence's testimony was not

unlawfully obtained. Police committed no misconduct in this case, hence the policies underlying the Fourth Amendment are not invoked. We recognize, however, that Spence received a form of qualified immunity when he testified at the motion to suppress his confession. (*Simmons v. United States* (1968) 390 U.S. 377, 389–394 [19 L.Ed.2d 1247, 88 S.Ct. 967] (*Simmons*).) Thus, we are required to consider the purposes of the protection granted by *Simmons* and to balance the need for such protection against the public's need for truthful testimony. We hold that when the defendant's testimony at a suppression hearing is potentially contrary to a defense expert's opinion that was based in part upon discussion with the defendant, the rule established by *James* does not apply.

## A. Sequence of Testimony: Suppression Hearing and Trial

At the pretrial suppression hearing, Spence originally sought to show his statements to detectives at the April 22 interview were not voluntary in nature, including his dictated letter taken down by Detective Hoover, initially by arguing that he was in custody at the time and no *Miranda* warnings were given. As noted by the trial court during that hearing, the subject matter of the defense motion appeared to be expanding to include the issue of whether he had the ability to make voluntary choices and admissions of guilt, specifically in light of his diagnosis of dyslexia, low functioning level, and poor educational background, in a setting with authority figures such as the two female detectives. The two copied letters dated April 27 were not introduced into evidence at that time, but they were shown to Spence, and he admitted he knew how to write, that the two copied letters "looked like" they contained his signature and they were written in his handwriting, so he guessed he must have written them. Defense counsel objected that that topic went beyond the scope of the voluntariness hearing, and the court overruled the objection.

At trial, the prosecution's case-in-chief was submitted after Detective Hoover played the tape of the April 22 interview and testified about writing the dictated letter at Spence's request, after he admitted to the detectives he had touched D.'s private parts on April 20. Ruling on admission of exhibits was reserved. The defense presented its position that Spence had made false admissions and confessions, based in part on testimony from a defense expert, Richard Leo (a Ph.D. in psychology and criminology). Dr. Leo discussed in general terms the factors that contribute to why someone would falsely confess, such as getting away from the interrogators, responding to promises of some benefit, or being unable to distinguish between police officers and a prosecutor. Spence's circumstances showed those factors at work, in his opinion.

Spence additionally presented his expert psychologist, Dr. Waymon, to give opinions about his mental challenges as they affected his likelihood of making a false confession, including his general inability to read or write. Dr. Waymon obtained two short writing samples during his interview with Spence, and based his opinion on those factors as well as the educational records he reviewed (Spence's continuation school). On cross-examination, Dr. Waymon was shown the two copied letters and asked whether Spence could have written them, and he gave the opinion that the printing in them was better than the other "stuff" Spence had produced for him during their interview. Dr. Waymon said the two copied letters were of a writing ability such as a high school graduate or adult would have.

During rebuttal, Detective Hoover testified that at the time the two copied letters were seized (Apr. 28), Spence told her he wrote them. However, she never put that in any of her written reports.

The trial court heard argument on the admissibility of a defendant's testimony that had been given at a suppression hearing to use for impeachment of the defendant or of his expert witness. The court referred to the line of cases excluding from evidence a defendant's statements taken in violation of *Miranda*, except for impeachment purposes. The court acknowledged that Spence's testimony at the suppression hearing had been somewhat equivocal about whether he wrote the letters and whether it was his signature (he guessed so), but ruled, over defense objections, that the prosecution was entitled to present that reported testimony to rebut or impeach the evidence of Dr. Waymon, with respect to his opinion about whether Spence could have written those same letters. This was done by reading into the record approximately two pages of the testimony Spence gave during his pretrial suppression hearing, when he was shown the copied letters and admitted he knew how to write and the two copied letters looked like his writing and his signature.

In the jury instructions, the trial court explained that the evidence of the two copied letters could only be considered for purposes of determining Spence's reading and writing level, and if the jury concluded he did not write the letters, they should be disregarded. Also, instructions were given about the jury's use of Spence's statements made to Dr. Waymon, only for the limited purpose of evaluating the meaning and importance of that professional opinion. (CALCRIM Nos. 303, 332, 358, 360.)

It was not until the hearing on the new trial motion that the parties specifically discussed the authority of *James, supra*, 493 U.S. 307, and the trial court ruled it was inapplicable under these circumstances.

## B. Governing Law

■ This line of Supreme Court authority is introduced by a commentator as follows: "Under the various exclusionary rules, if a constitutional violation has occurred then upon a timely objection by a defendant with standing the fruits of that illegality must be suppressed and consequently may not be introduced into evidence at the criminal trial of that defendant. There exist, however, a few exceptions to that statement, one of which concerns the use of that evidence for impeachment purposes." (3 LaFave et al., Criminal Procedure (3d ed. 2011) Impeachment, § 9.6(a).) Further, "The reasons which justify some sort of impeachment exception as to Fourth Amendment violations might well be thought not to carry over to violations of the Fifth Amendment privilege against self-incrimination. . . . Moreover, the Fourth Amendment exclusionary rule is a court-created device intended to deter the police, and thus arguably ought not be applied when the objective of deterrence is outweighed by other considerations, while by contrast the Fifth Amendment on its face prohibits the government from using 'compelled' statements 'against' a defendant." (*Ibid.*) Nevertheless, the impeachment exception has been extended to allow use of *Miranda* violation evidence directly against a defendant (e.g., *Harris v. New York, supra*, 401 U.S. 222, and *Oregon v. Hass* (1975) 420 U.S. 714 [43 L.Ed.2d 570, 95 S.Ct. 1215]), because " 'inadmissibility would pervert the constitutional right into a right to falsify.' " (3 LaFave et al., Criminal Procedure, *supra*, § 9.6(a).)

### 1. Simmons *Doctrine; Exception for Impeachment*

■ *Simmons, supra*, 390 U.S. 377, 389–394 established the rule that when a defendant gives testimony in support of a motion to suppress evidence on Fourth Amendment grounds, that testimony is not to be admitted against him as proof of guilt at trial, assuming an objection is made. The Supreme Court's reasoning was that a defendant's testimony of ownership of the challenged evidence is often necessary to establish standing to challenge its admission, and therefore "his testimony is to be regarded as an integral part of his Fourth Amendment exclusion claim," and such a decision to testify should not be unduly penalized. (390 U.S. at p. 391.)

In *Simmons, supra*, 390 U.S. 377, 393–394, the court acknowledged that as an "abstract matter," testimony is not always deemed involuntary simply because it is given to obtain a benefit, and "[a] defendant is 'compelled' to testify in support of a motion to suppress only in the sense that if he refrains from testifying he will have to forgo a benefit . . . ." (*Ibid.*) However, where such a " 'benefit' to be gained is that afforded by another provision of the Bill of Rights, an undeniable tension is created," and it is "intolerable that one constitutional right should have to be surrendered in order to assert another.

We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." (*Simmons, supra,* at pp. 393–394; see *People v. Kiney* (2007) 151 Cal.App.4th 807, 812–814 [60 Cal.Rptr.3d 168].)

■ However, the privilege against self-incrimation is not absolute and can be waived. (*People v. Humiston* (1993) 20 Cal.App.4th 460, 474–475 [24 Cal.Rptr.2d 515] (*Humiston*).) " '[T]he defendant waives the privilege with respect to any matter to which he testified expressly or impliedly on direct examination and that is relevant to impeach his credibility as a witness. [Citation.]' " (*Id.* at p. 474.) Thus: "[I]f a defendant testifies at a suppression hearing in superior court or a suppression motion at a preliminary hearing, his testimony may not be used against him by the prosecution in its case-in-chief. [Citation.] 'However, if a defendant's testimony at a pretrial suppression hearing is inconsistent with his testimony at trial, the People may use such pretrial testimony for impeachment. [Citation.]' [Citation.] This rule does not force a defendant to choose between a valid Fourth Amendment claim and the Fifth Amendment right against self-incrimination. 'He may testify truthfully at his suppression motion should he elect to do so. In the event that he chooses to testify truthfully at trial, he runs no risk of being impeached. He has, however, no right to commit perjury and is not entitled to a "false aura of veracity." [Citation.] If his trial testimony is inconsistent with that previously given at the suppression hearing, he may be impeached therewith. [Citations.]' " (*Humiston, supra,* 20 Cal.App.4th 460, 474–475, italics omitted; see *People v. Beyah* (2009) 170 Cal.App.4th 1241, 1249–1250 [88 Cal.Rptr.3d 829] [applying this reasoning in the context of alleged instructional error].)

### 2. James *Doctrine: Defendant and/or All Defense Witnesses*

As outlined above, when a defendant testifies at a suppression hearing, the use of that testimony is precluded at trial during the prosecution's case-in-chief, to protect the defendant's right to challenge the admission of evidence as illegally obtained. Such suppression hearing testimony, however, may become admissible as impeachment of a defendant who chooses to testify.

The problem in *James, supra,* 493 U.S. 307, 311–312, was whether the defendant's incriminating statements, which were obtained during an illegal arrest or through police misconduct, should become available as impeachment evidence against a percipient, third party, nonexpert witness, who provided testimony that was inconsistent with the unwarned statements of the defendant. There, the court applied its existing two-part test for allowing exceptions to the exclusionary rule applicable to illegally obtained evidence,

which considers whether (1) the introduction of such evidence, if reliable and probative, would significantly further the truth-seeking function of a criminal trial and (2) it is only speculative and unlikely that admissibility of such evidence would encourage police misconduct. (*Harris v. New York, supra,* 401 U.S. 222, 225; *Walder v. United States* (1954) 347 U.S. 62 [98 L.Ed. 503, 74 S.Ct. 354] (*Walder*).) As one exception to the rule, prosecutors can introduce otherwise inadmissible evidence for the limited purpose of impeaching the credibility of the defendant's own testimony. (*James, supra,* at pp. 311–312.)

In *James, supra,* 493 U.S. 307, 314–320, the court declined to extend this impeachment exception to the exclusionary rule to cover "all" defense witnesses, not just the defendant himself. In that case, when the defendant was illegally arrested, he made incriminating statements to police (later suppressed, concerning his hairstyle and color [slicked-back red] the day before, when the shooting offense occurred in which he was a suspect; he told police he was changing his hair to curly and black to change his appearance). (*Id.* at p. 309.) Identity of the shooter was an issue, in particular his hairstyle and color (slicked-back red). (*Id.* at p. 310.) At trial, the defendant had a female family friend witness testify about seeing his hair color on the day of the offense of which he was accused (black). The prosecution sought to impeach the witness with the contradictory statements on that subject that were made by the defendant at his arrest (he had slicked-back red hair the day before and was now changing his appearance). (*Ibid.*)

Over a strong dissent, the majority opinion in *James, supra,* 493 U.S. 307 determined that the impeachment exception should not be extended to this third party percipient witness, because "allowing a defendant's inculpatory statement, suppressed as fruit of an unlawful arrest, to be used to impeach other defense witnesses would not significantly promote the court's truth-seeking function as it would likely chill defendants from presenting a defense through the testimony of others. [Citation.] The court also determined that admitting the suppressed statement to impeach all defense witnesses would encourage police misconduct to obtain evidence unlawfully, as such evidence could be used against potentially many more witnesses. [Citation.]" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 283 [107 Cal.Rptr.3d 228] (*Johnson*), citing *James,* at pp. 314–319.)

For purposes of dealing with the appropriate limitations upon cross-examination or rebuttal of the opinion of a defense expert witness, as opposed to direct impeachment of a testifying defendant through the use of the defendant's testimony at a previous suppression hearing, we will assume the slightly different exclusionary rules that arise out of Fourth Amendment and Fifth Amendment protections may be analyzed with the same concerns:

promoting the truth-seeking function of a criminal trial, with introduction of only such evidence that is reliable and probative, while avoiding any encouragement of police misconduct that would use illegal methods for gaining evidentiary material. (*James, supra,* 493 U.S. at pp. 311–312; see *People v. Trujillo* (Colo. 2002) 49 P.3d 316, 322 ["[A] close reading of *James* demonstrates that its rationale is as dispositive when the statement was obtained in violation of the Fifth Amendment as when evidence is obtained in violation of the Fourth Amendment. *James* rests upon Supreme Court precedent dealing with the exclusion of evidence 'illegally obtained' in violation of both the Fourth and Fifth Amendments." (italics omitted, quoting *James,* at pp. 312–313)].)

### 3. *Post*-James *Interpretations*

Case law such as *Wilkes, supra,* 631 A.2d 880 has developed the principles expressed in *James,* attempting to determine whether its broad language covers situations not described or expressly anticipated by the facts in *James.* (See *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] [an opinion is not authority for a proposition not therein considered].) In *Wilkes,* the majority opinion applied the case-by-case balancing of interest test set out in *James,* to resolve the question of what proposed impeachment, of which witnesses other than the defendant, is permissible. (*Wilkes, supra,* 631 A.2d 880, at pp. 887–889 & fn. 17, citing *Martinez v. U.S.* (D.C. 1989) 566 A.2d 1049, 1055–1056.)

In *Wilkes, supra,* 631 A.2d 880, a defense mental health expert testified about his diagnosis of the defendant (who was presenting an insanity defense), and the expert said his diagnosis was based " 'in large part' " on the defendant's telling him he did not remember the charged shooting incidents. (*Id.* at p. 889.) The issue was whether the defendant's statement to the police, which had been suppressed as in violation of his *Miranda* rights, could be used to impeach the defense expert. (*Wilkes, supra,* at p. 889.) The custodial statements by the defendant could logically have led to a different expert opinion (e.g., he did remember disposing of the gun that he did it with, i.e., shooting the victims). (*Ibid.*)

The court in *Wilkes* said that *James, supra,* 493 U.S. 307 "emphasized that the purpose of the impeachment exception is to discourage defendants 'in the first instance from "affirmatively resort[ing] to perjurious testimony." ' [Citation.] The exception enables defendants to testify truthfully and avoid admission of the suppressed evidence, provided they do not open the door by contradicting the suppressed evidence. Hence the impeachment exception, properly applied, accommodates competing societal and individual interests." (*Wilkes, supra,* 631 A.2d at p. 888.)

In *Wilkes*, the court relied on and distinguished *James, supra*, 493 U.S. 307, and determined that it did not preclude such impeachment of a defense expert with illegally obtained, excludable statements. The court in *Wilkes* stated that *James* should be read "as principally rejecting an overly broad principle rather than establishing one of its own." (*Wilkes, supra*, 631 A.2d at p. 887.) The Supreme Court explained in *James* that " 'the truth-seeking rationale . . . of *Walder* and its progeny does not apply to other witnesses [i.e., defense witnesses other than the defendant] with equal force.' [Citation.] We read this language as nothing more than a rejection of the idea that 'all defense witnesses' can be treated as a homogeneous group for the purpose of determining the scope of the impeachment exception. Thus the Court makes clear that there is no shorthand way to apply to 'all defense witnesses' en masse the balancing approach that is crucial to the impeachment exception." (*Wilkes, supra*, 631 A.2d at p. 887, italics omitted.)

Accordingly, the majority holding in *Wilkes, supra*, 631 A.2d 880, was that "the truth-seeking function of this trial 'was better served by [allowing the expert to be cross-examined about the unwarned statements] than the deterrent function would have been by [their] exclusion.' " (*Id.* at p. 889; see *People v. Trujillo, supra*, 49 P.3d 316, 325 [a different example of when a defendant's unwarned custodial statements may be admitted to impeach a third party defense witness, when the defendant does not testify, occurs "when a defense witness testifies specifically about what the defendant told her, i.e., the defendant's hearsay is admitted, and he may then be impeached as a hearsay declarant with his own unwarned custodial statements" (that is not Spence's case)].)

In *Wilkes, supra*, 631 A.2d 880, a strong dissent disagreed that the majority could use such a balancing approach, in light of the broad language of the *James* holding: ". . . I do not believe the Supreme Court has left it open to us 'to strike a balance between the truth-seeking function of a trial and the deterrent function of the exclusionary rule,' [citation], each time the prosecution desires to impeach a defense witness (other than the defendant) with illegally obtained evidence. Were we free to conduct that balancing, I might agree with the majority that the deterrent effect of a perjury charge—stressed in *James*—has little application to 'a defendant who knows that his untruths will simply be relied upon and repeated to the jury on his behalf by his psychiatrist.' [Citation.] In other respects too impeachment of a psychiatric witness may present a special case. But I believe *James* forecloses this sort of case-by-case balancing of interests where proposed impeachment of a witness other than the defendant is involved." (*Id.* at p. 893 (dis. opn. of Farrell, J., fns. omitted.)

In *U.S. v. Trzaska* (E.D.N.Y. 1995) 885 F.Supp. 46, 50 (subsequent history, *post*), a firearms possession prosecution, the court discussed the authority of

*James, supra,* 493 U.S. 307 and *Wilkes, supra,* 631 A.2d 880. The court determined that an illegally obtained statement of the defendant (to a probation officer that " 'I'm a drug addict with this. It[']s a sickness,' " made regarding his emotional attachment to weapons) was admissible in impeachment of his out-of-court statement, that was being testified to by his son on direct examination (that the defendant told him that he had given up guns). (*U.S. v. Trzaska, supra,* at p. 47.) The court said, "The considerations underlying James are not applicable here. Unlike the *James* situation, the defendant himself is the real witness." (*U.S. v. Trzaska, supra,* at p. 49, revd. on other grounds (2d Cir. 1997) 111 F.3d 1019; he was retried and convicted of the same crime, and resentenced; on the later appeal, the judgment and sentence of the district court was affirmed in *U.S. v. Trzaska* (2d Cir. 1999) 181 F.3d 84.) The impeachment issue discussed in the original decision (*U.S. v. Trzaska, supra,* 885 F.Supp. 46, 50) was not affected by this subsequent history.

In *People v. Boyer* (2006) 38 Cal.4th 412 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*), the court set forth the reasoning for allowing impeachment of a testifying defendant with evidence that was obtained in violation of the defendant's rights, even though the illegally obtained evidence could not be introduced in the prosecution's case-in-chief. "In such cases, the interest in deterring illegal police conduct is not sufficient to accord the defendant a license to commit perjury." (*Boyer, supra,* at p. 462, citing, e.g., *Oregon v. Hass, supra,* 420 U.S. 714 and *Harris v. New York, supra,* 401 U.S. 222.) In *Boyer,* the defendant was appealing his convictions of murder a second time, after his first convictions were thrown out because of prejudice from admission of an illegal confession he made while in police custody. (*Boyer, supra,* at p. 431.) In connection with the original trial, the defendant made damaging statements to several defense mental health experts. Further preparation took place for the second trial, from which the illegal confession would be excluded, and the defendant again consulted a mental health expert, Dr. Klatte. (*Id.* at pp. 458–461.) Dr. Klatte had access to the other experts' testimony or reports in forming his own expert opinion of the defendant's mental state. When Dr. Klatte testified about the defendant's mental state, the prosecution sought to impeach him with contradictory statements that the defendant had made to the other experts. Such impeachment was allowed, and on the second appeal, the defendant argued the original consultations with the mental health persons remained the " 'tainted fruit' " of his earlier, illegal confession. (*Ibid.*) (We do not summarize all of the complexities of the *Boyer* holding, and only its treatment of *James, supra,* 493 U.S. 307 is relevant here.)

In *Boyer, supra,* 38 Cal.4th 412, the court held it was not error to allow the prosecutor to cross-examine Dr. Klatte about the foundation for his expert opinion, which included the defendant's inconsistent statements to other

mental health experts. After discussing the authority of *James*, the court found it to be distinguishable, because in defendant Boyer's case, "[t]he basis for impeachment was not the confession, or any testimony defendant gave in direct consequence thereof, but otherwise pertinent and admissible evidence generated by the defense as part of its own preparation for the prior trial." (*Id.* at p. 463.) The Supreme Court took the view that the impeachment of the expert was proper because the mental health consultations were not pursued as any direct result of any illegal police conduct, but instead, the defense had made tactical decisions to obtain the mental health evidence (even if done in anticipation of countering the illegal confession evidence). "Denying the prosecution the use of the impeachment evidence in this attenuated context would significantly undermine the truth-seeking process while having a negligible deterrent effect on police misconduct. We decline to strike that balance." (*Id.* at pp. 463–464, fn. omitted.) A defense expert cannot "assume a misleading aura of credibility" where there was no inappropriate use of an illegal confession. (*Id.* at p. 463.) Even if there was impeachment error, no prejudice resulted. (*Id.* at p. 464.)

In *Johnson, supra*, 183 Cal.App.4th 253, 274–275, the core of the evidentiary problem was that defendant Johnson had earlier confessed to robbery of Mr. Claussen, an uncharged offense, but that confession was suppressed. Then defendant Johnson, while being prosecuted for different offenses, sought admission of the statement from Mr. Claussen that Mr. Claussen could not identify defendant Johnson in a lineup, instead saying his own robber had been darker in color (which would have served as Johnson's third party culpability evidence, to blame his cousin instead as the accused serial robber). Under Evidence Code section 352, the trial court excluded the defense-offered evidence about Mr. Claussen's somewhat exculpatory statement because it was contradicted by defendant Johnson's suppressed confession, and the court did not want to put evidence before the jury that defendant Johnson knew to be untrue. On appeal, defendant Johnson argued the trial court's reliance on the suppressed confession amounted to a violation of the presumption of innocence that attached to him at trial. However, the appellate court applied the principles set forth in *James, supra*, 493 U.S. 307 and its predecessors, and rejected that claim.

In *Johnson*, the court used the *James, supra*, 493 U.S. 307 balancing test for evaluating the admissibility of evidence, but "in a context other than the prosecution's case-in-chief so as to avoid false testimony." (*Johnson, supra*, 183 Cal.App.4th 253, 282.) In either instance, this test ensures the trial court's truth-seeking function is furthered, and discourages police misconduct. (*Id.* at p. 281.) The court said, "Although we apply the balancing test announced in *James*, we reach a different conclusion on the facts presented to us. The reasoning of *James* is inapposite here. The trial court did not authorize use of Johnson's confession to impeach a witness. Rather, the court

considered the confession in order to prevent Johnson from extrapolating a false argument from truthful testimony. *James* was concerned that a broad exception to the exclusionary rule would chill defendants from calling witnesses 'who would otherwise offer probative evidence.' [Citation.] *James* said nothing about a defendant's attempt to use *Miranda* as a sword to force the jury to consider a false and misleading argument." (*Id.* at p. 283, some italics omitted.)

Other out-of-state cases have addressed similar questions. In a Colorado case, *People v. Trujillo, supra,* 49 P.3d 316, 318, the court concluded that "a defendant's voluntary, unwarned, custodial statements may only be used to impeach the defendant if he testifies at trial. If the defendant does not testify at trial, such unwarned custodial statements may not be used either to rebut a defense theory or to impeach a witness other than the defendant." That defendant's main ·theory of defense was that he did not know about his missed court appearance (which led to the current charges), due to his learning disabilities and poor memory. He did not testify at trial, but his unwarned custodial statements (about his knowledge of an outstanding arrest warrant for him and his intent to flee) were admitted to impeach his wife. She testified that the defendant was very forgetful, and "that he usually [told] her about court dates after a hearing and that if he did not tell her, she would write it in the day-timer when she found out about it later," but here she did not. (*Ibid.*) His admissions were used to impeach her as a witness. The court reversed his conviction, finding this impeachment of his wife's testimony about his knowledge was harmful error, beyond a reasonable doubt. Even though his unwarned custodial statements could not be used during the prosecution's case-in-chief as substantive evidence of his guilt, the trial court let them in for impeachment purposes of the third party witness, and the Colorado court said that was error, violating his Fifth Amendment privilege against self-incrimination. (49 P.3d at p. 325.)

In *People v. Williams* (1998) 181 Ill.2d 297 [229 Ill.Dec. 898, 692 N.E.2d 1109] (*Williams*) the defendant testified at the guilt phase of a death penalty trial that he shot the victim, a police officer, in self-defense. However, just after the shooting, while he was in pain and being treated for his own gunshot wound, the defendant told a paramedic that he shot the officer because he did not want to go back to jail. The defendant's pretrial motion to suppress that statement was denied and it was correctly deemed voluntary. (*Id.,* 692 N.E.2d at pp. 1116–1119.) Later, during the sentencing hearing, the prosecutor used this voluntary statement in cross-examination of the defendant's witness Dr. Brown, a mental health expert. Dr. Brown testified that he believed, from interviewing the defendant that the defendant thought he needed to shoot the officer in order to "protect himself." (*Id.* at pp. 1126–1127.) During that cross-examination, Dr. Brown could not recall whether defendant informed him of what he had earlier told the paramedic (that he shot the officer because

he did not want to go to prison). The appellate court found it had been proper to ask the expert about the prior suppressed statement, because that voluntary statement would be extremely significant to the validity of the expert's conclusions. (*Ibid.*)

Later, the court modified its opinion when it denied rehearing, to clarify that *James, supra,* 493 U.S. 307 was inapplicable to the facts in that case. (*Williams, supra,* 692 N.E.2d 1109, 1128–1129.) This cross-examination of the expert, described above, was allowable, as going to the defendant's state of mind at the time of the shooting, regardless of the opinions expressed in *James*: "The testimony elicited from Dr. Brown during cross-examination was used not to impeach the expert, but rather to test the soundness and fairness of the expert's opinion regarding defendant's state of mind at the time of the shooting. This type of questioning is within the proper scope of cross-examination." (*Williams, supra,* at p. 1128.)

## C. Analysis

We next address the effect of the rules of *Simmons, supra,* 390 U.S. 377 and *James, supra,* 493 U.S. 307 when it is not a defendant who is testifying (who would clearly be impeachable with his prior testimonial statements at a suppression hearing), but the prosecution instead seeks to rebut the opinion testimony of a defense expert (who relied on some of the defendant's statements in forming the expert opinion), by offering into evidence the defendant's prior testimonial statements at the suppression hearing, and those statements arguably undermine the validity of that opinion.

Generally, the bases and reliability of an expert's opinion are proper grounds for cross-examination and impeachment. "The most important inquiry of an expert witness concerns the matter on which the witness's opinion is based and the reasons for the opinion." (3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 265, p. 381; see Evid. Code, § 721, subd. (a) ["witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion"].) " 'A party "may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution was entitled to attempt to discredit the expert's opinion. [Citation.] . . ." ' [Citation.]" (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1325 [63 Cal.Rptr.3d 433, 163 P.3d 118].)

In this case, Dr. Waymon was giving his opinion about Spence's ability to express himself in writing, and referred to samples he had personally

obtained (the tiny and strangely spaced writing), before being presented with the two copied letters, which could have led him to form a different opinion. The prosecution refrained from requesting to read the suppression hearing testimony to the jury, until it was deemed necessary to rebut the opinion expressed by Dr. Waymon about Spence's impaired ability to express himself in writing. The suppression hearing testimony about the two copied letters would ordinarily have been probative rebuttal evidence, assuming the rules of *James* do not apply in this context. In analyzing this question, we need not express any opinion about whether the expert witness was lying, or was acting as a "mouthpiece" or "proxy" for the defendant, or whether an expert opinion is true or false. (See *James, supra*, 493 U.S. 307, 314; *Wilkes, supra*, 631 A.2d 880, 889–890 ["A doctor who accurately recounts what his patient has told him, and in so doing properly discloses to the fact-finder the basis for his opinion, does not commit perjury simply by relating untruths told to him by his patient."].)

■ Instead, the proper inquiry should be whether an expert's opinion is well founded in his or her research and analysis, so as to be useful to the jury, and the opinion may be challenged through appropriate impeachment evidence, "by rebuttal through introduction of evidence other than the testimony of the witness sought to be discredited." (31A Cal.Jur.3d (2010) Evidence, § 787, pp. 408–409.) It is significant here that Spence's motion to suppress the evidence about his admissions to detectives was unsuccessful. In *Boyer, supra*, 38 Cal.4th 412, the defendant was basing his claim that the impeachment of the mental health expert was fruit of the poisonous tree, based on the earlier illegal and suppressed confession.

Here, however, Spence's statements to the detectives that he molested D. were admitted into evidence, as well as the dictated letter, and the interview tape was played for the jury. Spence cannot claim his admissions about the two copied letters amounted to "misused" fruit of a poisonous tree, because his admissions at the suppression hearing were voluntary and they were not used to prove his guilt. It was not until the rebuttal stage that Detective Hoover testified that Spence admitted to her that he had written the two copied letters, at the time of his arrest. The two copied letters had been shown to Dr. Waymon to challenge his opinion that Spence could not express himself in writing. The prosecutor was then allowed to read the suppression hearing testimony by Spence into the trial record, admitting that he must have written the letters and those were his signatures.

Since Spence's main defense was that he is sufficiently mentally challenged so that he was very likely to make a false confession when requested to do so by authority figures (the detectives), and/or that the evidence against him was mainly trumped up by Ms. Smith, this sequence of events shows that

the door was legitimately opened for impeachment of Dr. Waymon's expert opinion to the extent his testimony was being used in support of those defenses. The reasoning expressed in *James, supra*, 493 U.S. 307 is not applicable to the case before us. Even though the Supreme Court in that case stated its conclusions sweepingly, by discussing the impeachment exception as not being extended to "all defense witnesses," it must be acknowledged that its discussion of the applicable policies was engaged in with specific reference to the facts before it. (*Id.* at pp. 309–320.) The facts before this court are different from those in *James*, and when we apply its balancing test, we find that allowing the impeachment of the expert witness's opinion, by presenting the excerpt from Spence's suppression testimony, will best promote truth seeking; it will not chill defendants "from presenting their best defense—and sometimes any defense at all—through the testimony of others" (*James, supra*, at pp. 314–315), and it will not "unduly encourage police misconduct by preserving a broad area in which the evidence could be used despite its illegal procurement." (*Boyer, supra*, 38 Cal.4th at p. 462.)

█ It was appropriate for the prosecutor to use Spence's suppression hearing testimony about the two copied letters to undermine Spence's expert's analysis of Spence's writing ability, which the defense was using to support his claim he did not voluntarily admit to molesting D. The focus properly remains on Spence's own theory of defense and his own abilities, not upon any witness intimidation risks or police misconduct risks contemplated by *James, supra*, 493 U.S. 307. (*Johnson, supra*, 183 Cal.App.4th 253, 284.) Moreover, there should be no institutional concerns about the reliability of Spence's suppression hearing testimony, such as if a confession had been beaten out of him through *Miranda* violations.

In an important sense, as in *U.S. v. Trzaska, supra*, 885 F.Supp. 46, "The considerations underlying *James* are not applicable here. Unlike the *James* situation, the defendant himself is the real witness." (*Id.* at p. 49.) As in *Johnson, supra*, 183 Cal.App.4th 253, the suppression testimony was used "in order to prevent [the defendant] from extrapolating a false argument from truthful testimony." (*Id.* at p. 283.)

█ A defendant " 'may testify truthfully at his suppression motion should he elect to do so,' " without being forced to choose between a valid Fourth Amendment claim and the Fifth Amendment right against self-incrimination. (*Humiston, supra*, 20 Cal.App.4th 460, 474–475, italics omitted.) Next, " 'in the event that he chooses to testify truthfully at trial, he runs no risk of being impeached. He has, however, no right to commit perjury and is not entitled to a "false aura of veracity." [Citation.]' " (*Ibid.*, italics omitted.) Likewise, we think that if a defense expert gives at trial what is represented to be his or her valid, soundly based opinion, and if something in the defendant's previous

testimony at the suppression hearing is inconsistent with a material aspect of that opinion, there should be no constitutional or policy bar to admitting the defendant's own suppression hearing testimony into evidence to contradict the opinions of his own expert, at least in cases such as this where the expert has interviewed the defendant and relies in part on the defendant's statements.

In addition, the trial court properly admitted the suppression hearing testimony about the two copied letters only for the limited purpose of establishing whether Spence could read or write, and not as to his guilt for the charged crime. The jury received instructions about how to evaluate Spence's out-of-court statements along with other evidence, and about interpreting Spence's statements that the expert considered in reaching his opinion (only for evaluating the meaning of that opinion). We may presume the jury followed the court's instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436 [127 Cal.Rptr.2d 544, 58 P.3d 391].) These safeguards ensured there were no violations of Spence's rights to a presumption of innocence, to his *Miranda* protections, or to present a suppression motion and his defense.

Because we do not find there was any constitutional or evidentiary error, we need not discuss the standard for measuring the harmfulness or prejudice resulting from any such error. (*Boyer, supra*, 38 Cal.4th 412, 464.)

III

*HYPOTHETICAL QUESTIONS TO EXPERT DOCTOR*

Spence next contends the trial court prejudicially erred when it permitted the prosecutor to ask, over his objection, an improper hypothetical question of the child abuse expert physician. The prosecutor mentioned Spence by name, tentatively identifying him as the accused, when asking if any evidence the expert considered would have contradicted the claims by D. that Spence sexually assaulted her. Spence argues the question and answer deprived him of due process by going beyond the proper scope of expert opinion and allowed the expert to usurp the jury's function by rendering findings of fact. To consider his claims, we first outline the relevant portions of the record, set forth applicable legal standards, and evaluate the record in this light.

A.   Sequence of Testimony; Instructions Given

For the prosecution, Dr. Vivanco testified about her interview and examination of D. on the day after D. told her mother of the incident. D. told Dr. Vivanco that Spence had put his fingers inside her "privacy" and put his "privacy" in her bottom. Dr. Vivanco described her physical findings (injury

marks in D.'s genital area), and the results of DNA tests on male body fluids found on D. Neither Spence nor his visiting friend, Williams, could be excluded as a possible donor of such genetic material.

Some of the conclusions in Dr. Vivanco's report were later criticized by a defense expert, registered nurse Cari Caruso, who specialized in pediatrics and women's health. Nurse Caruso stated there were possibilities other than sexual assault for causing these types of injuries. Nurse Caruso disagreed with Dr. Vivanco's statement that where the anus of a child has been penetrated by an adult as reported here, there might be no visible evidence of an injury.

In the questioning that is challenged on appeal, the prosecutor asked Dr. Vivanco, "if someone by the name of [D.] says that she is sexually assaulted by someone by the name of James Spence, is there any evidence that you tested in this case that contradicts that story?" The trial court overruled defense counsel's objection this was an improper hypothetical. Dr. Vivanco replied that every stain she tested gave DNA results that James Spence could not be excluded from: "So I don't have any—I don't have any results that would be inconsistent with that. There may be another explanation, but I don't have any results inconsistent with—all of the DNA that I have ends up having some consistency with the DNA test from Mr. Spence." Around the same time, the trial court did not permit defense counsel to ask a different hypothetical question: whether any of the male jurors could or could not be excluded as a potential DNA donor.

Among other relevant instructions, the jury received CALCRIM No. 332, informing it that "[a] hypothetical question asks a witness to assume that certain facts are true and then give an opinion based on those facts. It's up to you to decide whether an assumed fact has, in fact, been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

### B. Pertinent Law

■ "California law allows expert testimony that is related 'to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (1 Witkin, Cal. Evidence, *supra*, Opinion Evidence, § 98, p. 746, quoting Evid. Code, § 801, subd. (a).) ■ Evidence Code section 805 permits such testimony to embrace an ultimate issue in the case, but experts may not offer their legal conclusions to the jury. (1 Witkin, Cal. Evidence, *supra*, § 98, pp. 745–746, and cases cited.)

In *People v. Gonzalez* (2006) 38 Cal.4th 932 [44 Cal.Rptr.3d 237, 135 P.3d 649] (*Gonzalez*), the court addressed an argument that a gang expert should

not have expressed his expert opinion at trial, in response to hypothetical questions, about whether there had been witness intimidation by gang members. The court determined that the expert had "merely answered hypothetical questions based on other evidence the prosecution presented, which is a proper way of presenting expert testimony." (*Id.* at p. 946.) The expert did not inappropriately set forth his own opinion about whether the witnesses in this case had been intimidated by anyone in particular, but instead, the opinion could properly be viewed by the fact finder, together with other evidence, and be found probative on the intimidation issue. (*Id.* at p. 947.)

The court in *Gonzalez, supra,* 38 Cal.4th at page 947 distinguished an earlier case, *People v. Killebrew* (2002) 103 Cal.App.4th 644 [126 Cal.Rptr.2d 876] (*Killebrew*), disapproved on another point in *Vang, supra,* 52 Cal.4th at page 1047, to the extent it seemed to say that an expert could not permissibly render opinions about the intent of specific persons in a conspiracy, nor could he opine about the likely expectations of hypothetical persons, and explained: "Obviously, there is a difference between testifying about specific persons and about hypothetical persons. It would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons." (*Gonzalez, supra,* at p. 946, fn. 3.)

Later, in *Vang, supra,* 52 Cal.4th 1038, 1048, footnote 3, the court expressly disapproved "of any interpretation of *Killebrew, supra,* 103 Cal.App.4th 644, as barring, or even limiting, the use of hypothetical questions. Even if expert testimony regarding the defendants themselves is improper, the use of hypothetical questions is proper." The basic rule remains: " 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' [Citations.]" (*Vang, supra,* at p. 1048.)

Nevertheless, in *Vang, supra,* 52 Cal.4th at page 1048, footnote 4, the court said, "It appears that in some circumstances, expert testimony regarding the specific defendants might be proper. [Citation.] The question is not before us. Because the expert here did not testify directly about the defendants, but only responded to hypothetical questions, we will assume for present purposes the expert could not properly have testified about the defendants themselves."

Thus, as referenced in *Vang, supra,* 52 Cal.4th at page 1048, footnote 4, in *People v. Valdez* (1997) 58 Cal.App.4th 494, 509 [68 Cal.Rptr.2d 135] (*Valdez*), the court upheld the admission of expert opinion testimony in a

complicated gang enhancement case, about whether certain conduct by the defendant in connection with numerous gangs was done for the benefit of his gang. The court in *Valdez* relied on classic rules that allow the trial court discretion to determine whether a particular expert opinion was "tantamount to an opinion of guilt." (*Id.* at p. 509.) Among other things, that expert's opinion was found to be permissible because it was partially probative of only one element of the gang enhancement allegation, and thus it was not unduly directive to the jury.

As relied on by the court in *Valdez*, *People v. Wilson* (1944) 25 Cal.2d 341, 349 [153 P.2d 720] sets out these basic rules: "There is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case. . . . '. . . [T]he true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved. . . . Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in.' [Citations.]" (*Wilson, supra*, 25 Cal.2d at p. 349, cited in *Valdez, supra*, 58 Cal.App.4th 494, 507.)

More generally, a trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717–718 [94 Cal.Rptr.2d 396, 996 P.2d 46].) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [40 Cal.Rptr.3d 118, 129 P.3d 321].) Otherwise, a harmless error standard applies. (*People v. Watson* (1956) 46 Cal.2d 818, 835–836 [299 P.2d 243] (*Watson*).)

## C. Analysis

The parties disagree on whether the prosecutor's question at issue was hypothetical in nature. Spence focuses upon the conditional beginning of the question, "if someone by the name of [D.] says that she is sexually assaulted by someone by the name of James Spence, is there any evidence that you tested in this case that contradicts that story?" Spence says the expert was simply giving an impermissible opinion that the evidence showed only that he was guilty.

In contrast, the Attorney General's brief argues this was simply not a hypothetical question, because "[it] did not ask the expert to assume any

particular facts to be true, nor did it ask the expert to render an opinion based on those very facts, or ask the expert to opine whether the victim was truthful. Instead, the prosecutor's question was designed to inquire if any tests conducted were able to exclude [Spence] as the person who contributed the DNA that was discovered during the examination."

We think the more realistic approach in analyzing this dispute is to acknowledge that the medical expert arguably was asked to testify directly about the guilt of Spence, since the question posed named him and essentially asked whether he had any meritorious defense in the evidence, or was guilty. (See *Vang, supra,* 52 Cal.4th 1038, 1048, fn. 4.) It was not mainly hypothetical in nature but was meant to reiterate the views of the expert about the results of the laboratory tests.

Even though the questioner did not have "to disguise the fact the question was based on the evidence," this question tended to interfere with the jury's ability to decide the ultimate issues, including the probativeness of the laboratory tests, and also the credibility of D. in naming Spence as the accused. (*Vang, supra,* 52 Cal.4th at p. 1051.) The laboratory tests were not completely probative since they did not exclude either Spence or his friend Williams, who were both at the house that night. There was also some conflicting evidence about the proper interpretation of the physical findings about D.'s condition, as reported by Dr. Vivanco after her examination and interview, and as interpreted by the defense expert nurse.

In this light, we disagree with the Attorney General that "[t]he expert merely restated what had been testified to, namely, that appellant could not have been excluded from being the person whose DNA was found on the victim's clothing." A hypothetical question " 'must be rooted in facts shown by the evidence . . . .' [Citations.]" (*Vang, supra,* 52 Cal.4th at pp. 1045–1046.) The laboratory tests and physical evidence were only a portion of the evidence, and this question seemed to require the expert to speculate about the strength of the prosecution's case as a whole. " ' "Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" ' " (*Id.* at p. 1046.)

This question seems to unduly focus upon Spence as a presumptively guilty individual, and we disapprove of this form of questioning. We are satisfied, however, that any error in allowing it was harmless. (*Watson, supra,* 46 Cal.2d at pp. 835–836.) The expert testimony thus interpreting the laboratory test results was not the only proof of the charges, in light of D.'s own testimony, the evidence about the family circumstances, and admissions

by Spence about his acts of molestation, all of which could be evaluated by the jury. (See *Valdez, supra,* 58 Cal.App.4th 494, 507.) There was no deprivation of due process in the manner of questioning this expert witness.

## IV

### PRESENCE OF VICTIM ADVOCATE AND THERAPY DOG ON WITNESS STAND

Before D. testified, the court advised the jury that she would be accompanied to the witness stand by an advocate from the district attorney's office, as well as a therapy dog that would be sitting at her feet (over defense objection that this was excessive; e.g., Spence argued in limine, "a furry friend in the court will cast the witness in even a more sympathetic light"). On appeal, Spence argues these procedures or support system interfered with his due process rights to a fair trial and confrontation of witnesses, by serving to conclusively label D. as a victim who required the support not only of a "victim advocate," but also a therapy dog, to go to the witness stand, and before any verdict was reached.[4] He contends he was prejudiced in this respect when the trial court failed to comply with all statutory and case law requirements for allowing such accommodations (holding a hearing, making findings of necessity, and giving admonishments to the support person regarding her courtroom decorum).

At this point, it should be noted that Spence concedes on appeal that generally the prosecutor and the court were careful to refer to D. by her name, or as "the patient" in connection with her medical examination, rather than calling her a "victim." Spence nevertheless contends there was prejudice arising from these particular testimonial support arrangements (1) when the "victim advocate" was introduced to the jury by the prosecutor and (2) when the court announced that D. would be entering through a different door from the other witnesses. Spence suggests this special treatment was excessive under all the circumstances. We next outline the events which occurred and the applicable statutory scheme, to consider these claims of prejudice.

### A. Sequence of Events

At the outset of trial, the trial court considered a defense request to preclude the prosecutor from referring to D. as the "victim." The court denied

---

[4] The court and parties at trial referred to the dog as a courtroom or canine therapy dog. Although the Attorney General now prefers to use the term "courthouse facility dog," and seeks to have us address victim protection issues in a wider context, we need not and cannot expand the record and the issues in that way. Since the term "canine therapy dog" is somewhat redundant, we will refer to the dog in this case as a therapy dog or a support canine.

the motion but stated, "my antenna is up, and if I think either side is, you know, trying to suggest that the victim is a proved victim without being proved that she is truly a victim, I'd be happy to reconsider."

This issue next arose when the prosecutor stated that D. had requested the presence of a therapy dog while she was testifying, and sought permission to have the therapy dog and a victim advocate from her office, Ms. Figueroa, accompany D. to the witness stand. The reason for the request was that Spence's family was going to be present and there were concerns that D. might have an emotional meltdown and refuse to testify, since it could be a terrifying situation for her. Defense counsel responded that there would be only a limited number of Spence's family members present, and in any case, it would be agreeable to keep the victim advocate and therapy dog nearby to be available to D., such as in a jury room. However, he objected that it would be "overkill" to allow her to have such a support system with her on the witness stand.

Before empaneling the jury, the court granted these requests by the prosecutor on the grounds that as a witness, D. was "on the young side," and even adult victims may prefer to have advocates in the courtroom, and it was reasonably probable that testifying might be an intimidating situation for D. With respect to the use of the therapy dog, the court referred to the discretion granted to it under Evidence Code section 765 to control court proceedings in the search for truth,[5] and commented that there would be no prejudice in allowing the therapy dog to be present in the courtroom. The court said it was comparable to D. holding a "cute teddy bear in her hands" to provide her comfort. The court explained to counsel that this particular therapy dog had been in the same courtroom before, "and she's almost unnoticeable once everybody takes their seat on the stand. She's very well-behaved and does nothing but simply sit there. And so if that does make it easier for [D.] to testify, I am going to allow it." However, if any issues or improper behavior

---

[5] Evidence Code section 765 provides in relevant part that the trial court shall exercise reasonable control over the mode of interrogation of a witness, to expedite it and to protect the witness from undue harassment or embarrassment. With respect to witnesses under the age of 14, section 765, subdivision (b) requires the court to "take special care to protect him or her from undue harassment or embarrassment, and to restrict the unnecessary repetition of questions. The court shall also take special care to ensure that questions are stated in a form which is appropriate to the age or cognitive level of the witness. The court may, in the interests of justice, on objection by a party, forbid the asking of a question which is in a form that is not reasonably likely to be understood by a person of the age or cognitive level of the witness." Trial courts have inherent and statutory discretion to control the proceedings to ensure the efficacious administration of justice. (*People v. Cox* (1991) 53 Cal.3d 618, 700 [280 Cal.Rptr. 692, 809 P.2d 351].)

by the therapy dog occurred, it would be removed from the courtroom. The record does not show any such problems arose.[6]

When D. was called to the witness stand, the court informed the jury she would be entering through the back door rather than the front entrance to the courtroom. The People noted for the record that D. was "accompanied by a victim advocate named Norie Figueroa from our office and a canine therapy dog."

In instructions, the jury was told that the fact a crime was charged is not evidence the charge is true. (CALCRIM No. 220.) The jury was told to decide the case based on the evidence, not on any extrinsic factors such as sympathy, passion, or prejudice. (CALCRIM No. 200.) The instructions defining the charged crimes referred to D. by name or as a "child," rather than as the "victim," as did the instruction referencing her testimony. (CALCRIM No. 330.)[7]

## B.  Pertinent Law

In addition to the general discretionary standards set forth in Evidence Code section 765, for control of a courtroom, the provisions of Penal Code section 868.5, subdivision (a) apply to a prosecuting witness in a case involving a violation of Penal Code section 288 or similar sex offense. The witness "shall be entitled, for support, to the attendance of *up to two persons of his or her own choosing,* one of whom may be a witness, at the preliminary hearing and at the trial, . . . during the testimony of the prosecuting witness. Only one of those support persons may accompany the witness to the witness stand, although the other may remain in the courtroom during the witness' testimony. . . ." (§ 868.5, subd. (a), italics added.)

Under section 868.5, subdivision (b), whether or not the support person also serves as a prosecuting witness, "[i]n all cases, the judge shall admonish

---

[6] In discussing the application of "the 868 sections," the court referred to them as covering only preliminary hearings, but in any event did not rule out the applicability of other similar authority to justify an exercise of discretion to allow both the support person and the therapy dog to accompany D. to the stand. (The court expressly relied on Evid. Code, § 765.) Although section 868.5 is found in Criminal Procedure, part 2 of the Penal Code (in tit. 3, ch. 7, covering preliminary hearings or examinations), the language of the statutes is not limited to preliminary hearings, and in the case of section 868.5, subdivision (a), it expressly refers to trial and juvenile court proceedings. It is also interesting to note that although a long list of sex offense sections is given in section 868.5, section 288.7 is not one of them. Here, charges were also brought under section 288, which is covered by section 868.5, so that it clearly applies to these circumstances.

[7] The prosecutor offered in points and authorities that an instruction could be given to the jury that it should not take into consideration that the child witness used a therapy dog or support canine during her testimony, but the record does not indicate any such instruction was given or further pursued by either side.

the support person or persons to not prompt, sway, or influence the witness in any way. Nothing in this section shall preclude a court from exercising its discretion to remove a person from the courtroom whom it believes is prompting, swaying, or influencing the witness."[8]

It is established that a support person's mere presence with a witness on the stand, pursuant to section 868.5, does not infringe upon a defendant's due process and confrontation clause rights, unless the support person improperly interferes with the witness's testimony, so as to adversely influence the jury's ability to assess the testimony. (*People v. Myles* (2012) 53 Cal.4th 1181, 1214 [139 Cal.Rptr.3d 786, 274 P.3d 413] (*Myles*); *People v. Patten* (1992) 9 Cal.App.4th 1718, 1725–1733 [12 Cal.Rptr.2d 284] (*Patten*).)

In *People v. Adams* (1993) 19 Cal.App.4th 412 [23 Cal.Rptr.2d 512] (*Adams*), the court relied on confrontation clause cases, *Coy v. Iowa* (1988) 487 U.S. 1012 [101 L.Ed.2d 857, 108 S.Ct. 2798] and *Maryland v. Craig* (1990) 497 U.S. 836 [111 L.Ed.2d 666, 110 S.Ct. 3157], to conclude that insufficient findings of necessity had been made in the case before it to allow a witness to also serve as the victim's chosen support person. The court acknowledged that section 868.5 "does not articulate the requirement of a case-specific finding of need," but found that the circumstances of that case would have justified such findings, although the lack of them was harmless error. (*Adams, supra*, at pp. 443–444.)

In *People v. Lord* (1994) 30 Cal.App.4th 1718, 1721 [36 Cal.Rptr.2d 453], the court stated that the *Adams, supra*, 19 Cal.App.4th 412, requirement of an express showing of necessity regarding a support person who was also a witness was "debatable," since the required showing is already implicitly set forth in the statute, which requires that "the support person's attendance 'is both desired by the prosecuting witness for support and will be helpful to the prosecuting witness.' " (*Lord, supra*, at p. 1722, quoting § 868.5, subd. (b).)

In *People v. Johns* (1997) 56 Cal.App.4th 550, 553–556 [65 Cal.Rptr.2d 434] (*Johns*), the court rejected claims by the defendant and appellant that the trial court erred in permitting the mother of an 11-year-old sex offense victim to sit with him on the witness stand as his support person, pursuant to section

---

[8] With respect to the count 4 charge and conviction under section 288, the provisions of subdivision (d) of that same section additionally required the court, in this sex crime case involving a child victim or dependent person, to consider the needs of that witness, by doing whatever is necessary, within existing budgetary resources and constitutional limitations, "to prevent psychological harm to the child victim . . . resulting from participation in the court process." Section 868.8 also supplies procedures to ensure there are special courtroom precautions for a disabled or a minor victim of an alleged sex offense, such as informality of procedures, testimony during school hours, and other measures to increase the comfort level of the victim. Those latter protections are not specifically implicated by this record.

868.5. The defendant claimed his due process right to confront witnesses had been interfered with, or there would be undue distraction. (*Johns*, at pp. 553–556.) The court in *Johns* disagreed with any suggestion in *Adams, supra*, 19 Cal.App.4th 412 that further express findings of necessity had been required to justify the presence of a nonwitness support person. The court acknowledged that in the *Adams* case, other factors had justified a higher level of scrutiny there, such as the "issue of intertwining the credibility of that witness [(also a support person)] and the victim in the eyes of the jury, which was not present here. In addition, there was an allegation in *Adams* that the support person, who was the victim's father, had abused the victim, which could have motivated the latter to report the crimes as she did. Thus, there was more of a danger that his presence with her on the stand could influence her testimony, which was not present here." (*Johns, supra*, at p. 554.)

Pending appeal, the Attorney General supplied a supplemental authority, *State v. Dye* (2012) 170 Wn.App. 340 [283 P.3d 1130, 1134] (*Dye*), in which an appellate court in Washington found there was no prejudice when the trial court allowed a dependent, childlike adult, who feared the defendant, to have a therapy dog (Ellie) accompany him to the witness stand while testifying about a burglary of his home, of which the defendant was accused. The court relied on several factors to find there was no error in that procedure, such as (a) the court's discretion to control courtroom proceedings and witness examination; (b) the absence of any claim of interference by the dog's presence with the defendant's right to confront and cross-examine the victim-witness; (c) the lack of any indication the dog's presence alone communicated to the jury any presupposition of this witness's "very victim-hood"; and (d) the absence of any indication there had been any improper gifts or favors in this respect from the prosecutor to the victim-witness. (*Id.*, 283 P.3d at pp. 1132–1133.)

Further, in *Dye*, the appellate court determined that the trial court was not obligated to make express findings weighing the witness's need for emotional support from the dog against the possibility of prejudice to the defendant, since "the necessary balancing is implicit in the court's ruling. The court did not think Ellie would distract the jury, and observed that the dog was 'very unobtrusive [and] will just simply be next to the individual, not be laying [*sic*] in his lap.' " (*Dye, supra*, 283 P.3d 1130, 1134.) Also, the trial court had instructed the jury not to " 'make any assumptions or draw any conclusions based on the presence of this service dog,' " and the appellate court could presume the jury followed those instructions. (*Ibid.*)[9] From all of those

---

[9] In *Dye, supra*, 283 P.3d 1130, the Washington court discussed various authorities from different states that uphold trial court decisions that allowed child victims of sexual abuse to

factors, no error nor any prejudice to the defendant in *Dye* resulted from the use of the temporary companionship of the dog with the dependent adult witness.

In *Myles, supra,* 53 Cal.4th 1181, 1214, the court addressed claims that the presence of a support person in assistance to a victim-witness, during testimony, served to prejudice the defendant, by improperly influencing the jury's ability to assess that testimony. In that case, the record did not disclose any indication of advocacy or interference by the support person. (See *Patten, supra,* 9 Cal.App.4th at pp. 1732–1733.) The court found it significant that the trial court had informed the jurors that the witness "was entitled by law to be attended by a support person during her testimony," and the court "admonished them that the support person was 'not the witness.' " (*Myles, supra,* at p. 1215.) There, as here, the court instructed the jury to base its decision in the case solely on the evidence received at trial and not to be swayed by sympathy or prejudice. (*Ibid.*; CALCRIM No. 200.)

## C. Analysis: Therapy Dog

To evaluate Spence's arguments the court erred (1) when it allowed both the therapy dog and victim advocate to accompany the child to the witness stand, because section 868.5 permits only one support person or entity to do so, or (2) that no specific enough findings were made here, we look to the statutory language in section 868.5, as well as Evidence Code section 765, to provide the measure of the sufficiency of the express or implied findings made by the court, in the exercise of its overall discretionary power to oversee the court proceedings. We seek to implement the evident legislative intent and to avoid any hypertechnical readings that are inconsistent with the purpose of the sections. (*People v. Allegheny Casualty Co.* (2007) 41 Cal.4th 704, 708–709 [61 Cal.Rptr.3d 689, 161 P.3d 198].)

In relevant definitions, section 868.5, subdivision (a), provides that a specified witness "shall be entitled, for support, to the attendance of *up to two persons of his or her own choosing,* one of whom may be a witness, at the preliminary hearing and at the trial, . . . during the testimony of the prosecuting witness. Only one of those support persons may accompany the witness to the witness stand, although the other may remain in the courtroom during the witness' testimony. . . ." (Italics added.)

In Evidence Code section 175, a general definition of the term "person" is set forth, as including "a natural person, firm, association, organization,

---

hold dolls or stuffed animals while testifying, but we decline to use that analogy in this case, which presents a more specialized issue.

partnership, business trust, corporation, limited liability company, or public entity." The same type of language is found in Penal Code section 311, setting forth definitions regarding crimes against the person involving sexual assault, and crimes against public decency and good morals; in particular, regarding obscene matter offenses, the term "person" under section 311, subdivision (c) means "any individual, partnership, firm, association, corporation, limited liability company, or other legal entity." (See also § 313, subd. (c) [same language].)

From these definitions, it is easy to conclude that therapy dogs are not "persons" within the meaning of section 868.5, setting limitations on the number of "persons" who may accompany a witness to the witness stand. Moreover, since subdivision (b) of section 868.5 refers to the court's duty to give admonitions under section 868.5 that the advocate must not sway or influence the witness, we cannot imagine that the Legislature intended that a therapy dog be so admonished, nor could any dog be sworn as a witness in this context, so as to invoke the limitation on the number of support persons who may accompany a testifying witness to the stand. In any case, the trial court took care to ensure that the therapy dog would be mainly unnoticeable once everybody took their seats, and that corrective action would be taken if there was a problem, which there was not.

Thus, the circumstances of this case with respect to the use of the therapy dog simply do not fall within the coverage of section 868.5, setting limitations on the number of "persons" who may accompany a witness to the stand. The court appropriately exercised its discretion under Evidence Code section 765, subdivision (b), to set reasonable controls upon the mode of interrogation of the child witness, by providing a therapy dog in this exercise of "special care to protect [the witness] from undue harassment or embarrassment . . . ."

### D. Analysis: Support Person and Support System

To the extent Spence is alternatively claiming that the presence of the support person, Ms. Figueroa, caused him prejudice at trial, we reject his claim. The prosecutor's office brought in its staff victim advocate, who was not a witness, which was allowed by section 868.5, subdivision (a). There was no additional requirement under section 868.5, subdivision (b) that there be a showing of "helpfulness" to justify the presence of that particular support person, who was not a witness. (*Johns, supra,* 56 Cal.App.4th 550, 555.)

Although it would have been the better practice for the trial court to expressly make standard admonitions under section 868.5 that this support

person should not do anything to sway or influence the witness, the court could logically have assumed that it was not necessary to do so, because the nonwitness victim advocate from the district attorney's office was presumably familiar with courtroom decorum rules. The record does not show any problems occurred about her behavior or any undue influence on D.'s testimony. (See *Patten, supra,* 9 Cal.App.4th at pp. 1732–1733.)

It would also have been appropriate for the trial court, as referenced in *Myles, supra,* 53 Cal.4th 1181, to inform the jurors that the witness "was entitled by law to be attended by a support person during her testimony," and to admonish them that "the support person was 'not the witness.'" (*Id.* at p. 1215.) In any case, since the trial court in this case gave the standard instruction that the jury must base its decision solely on the evidence received at trial, without being swayed by sympathy or prejudice, it does not appear that any claim of prejudice from the support person's presence is available on this record. (*Ibid.*)

Under all the circumstances, we cannot say that the hazards identified in *Patten, supra,* 9 Cal.App.4th at page 1726, from the presence of a support person (or even a support dog) were present: "'(1) the potential of influencing the jury with a subconscious message that the victim is traumatized and therefore it is more likely the sexual assault occurred, and (2) the concern that the presence of a person supporting the witness may add credibility to the witness's testimony—i.e., the support person is vouching for the credibility of the witness.'" (*Johns, supra,* 56 Cal.App.4th at pp. 555–556; see *Dye, supra,* 283 P.3d at pp. 1133–1134.)

Moreover, to the extent that the presence of the victim advocate or the support dog could have been said to create any disruption or distraction, thus violating confrontation clause protections, the court in *Adams* said: "'[D]istraction and disruption in the courtroom are not absolutes, but are to be measured objectively in the context of the circumstances presented.' [Citation.]" (*Adams, supra,* 19 Cal.App.4th at p. 440.) The trial court was aware that D., who as a witness was "on the young side," had been tearful and upset when interviewed about her injuries by Dr. Vivanco and nurse Sager, and the prosecutor had concerns she would have an emotional meltdown on the stand. D. was interested in having the support dog present in court, as well as the support person, and the court's implied findings of necessity were justified.

Even assuming more specific or express findings of necessity would have been proper to justify having more than one support entity present upon the witness stand, in light of the general policies or statutory limitations in section 868.5, we are satisfied that any error in this respect was harmless. There was

sufficient other evidence, beyond the testimony of D., to justify the jury's findings, including testimony of other witnesses to whom she reported she was molested, and there was physical and forensic evidence in support of her story. There were admissions from Spence, including his dictated and copied letters of apology. No discernible prejudice arose from the support system used here.

## DISPOSITION

The judgment is affirmed.

Nares, J., and McIntyre, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 10, 2013, S208415.