Filed 8/24/15  P. v. Aguirre CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICARDO M. AGUIRRE,<br><br>    Defendant and Appellant. | B254605<br><br>(Los Angeles County<br>Super. Ct. No. VA125687) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas I. McKnew Jr., Judge.  Affirmed with directions.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

A jury convicted defendant and appellant Ricardo Moreno Aguirre of two counts of committing lewd or lascivious acts on a child under the age of 14. The victim was his stepdaughter, L., who was approximately six years old at the time. The jury acquitted Aguirre of four counts alleging that he committed various acts of forcible sexual assault against L. The trial court sentenced Aguirre to eight years in prison.

Aguirre challenges his conviction on two grounds. First, he argues that the trial court erred in admitting incriminating statements he made during a police interview. During the interview, Aguirre admitted he had shown L. his penis and had penetrated her mouth and her vagina or anus with it. He argues that, because he was in custody during the interview, the police should have read him his *Miranda*[1] rights before asking the questions that caused him to make the incriminating statements. Second, Aguirre argues that "comfort" given by a witness support person to the victim's mother while she testified violated his due process and confrontation rights. Because Aguirre was not in custody when he made the incriminating statements, and because the record does not support Aguirre's contention that the support person engaged in any improper conduct, we affirm Aguirre's convictions. We also direct the trial court to amend the minute order and abstract of judgment to conform to the court's oral pronouncement of sentence.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *The Crimes*

L. was born in June 2001. When she was two years old, Aguirre, who is not her biological father, married her mother. Aguirre and L.'s mother had a son together when L. was three years old. Aguirre and L.'s mother lived with the children in Bell Gardens.

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (*Miranda*).

Aguirre often watched the children while L.'s mother ran errands. When L. was five or six years old, Aguirre engaged in inappropriate sexual conduct while her mother was out of the house.

On one occasion, Aguirre called L. into his bedroom while she was playing with her half-brother in the living room. When she entered the room, Aguirre told her to remove her clothing, including her underwear. After L. complied, Aguirre removed his shorts and began touching his penis. Eventually L. observed that sperm came out of the tip of his penis, during or after which Aguirre put his penis inside L.'s mouth.[2] Aguirre removed his penis from L.'s mouth and began touching it again. He told L. to bend over on the bed with her back facing him, and he placed the tip of his penis in L.'s anus. After he had stopped touching her, Aguirre said, "Don't tell anybody or else I'll hurt part of your family." He instructed L. to put her clothes back on and leave the room.

On another occasion, a few days later, Aguirre called L. into the bathroom. Aguirre was wearing only a pair of shorts. He told L. to remove her clothes. L. again complied, and Aguirre removed his shorts and put his penis in her anus. Before he allowed L. to leave the bathroom, Aguirre again told her not to tell anybody about what he had done or he would hurt her family. For several years, L. did not tell anyone about either incident.

B.     *The Investigation*

In 2012, when she was 10 years old, L. told her mother that Aguirre had sexually abused her. Her mother reported L.'s allegations to law enforcement. Detective Rigo Barrios of the Bell Gardens Police Department investigated Aguirre.

---

[2]     L. was 12 years old when she testified. She explained that she saw white stuff come out of Aguirre's penis but she did not know what it was at the time of the incident. As she became older, she learned it was likely sperm.

During his investigation, Detective Barrios set up a pretextual telephone call between Aguirre and L.'s mother. L.'s mother called Aguirre and asked him whether he had sexually abused L. Aguirre initially denied showing L. his penis or touching her with it, but as L.'s mother continued to question him Aguirre admitted that he had shown L. his penis and put it near her mouth and genitals because he wanted to "demonstrate" what she should not let other boys or men do to her. Near the end of the conversation, Aguirre told L.'s mother that he had also touched L. with the "tip" of his penis.

Shortly after this telephone conversation, Detective Barrios asked Aguirre to come to the police station to discuss L.'s case. Aguirre met with Detective Barrios at the station and, after Aguirre left and then returned to the station, they discussed L.'s allegations. During the interview, Aguirre admitted that he had shown L. his penis, and that he had penetrated her mouth and either her vagina or anus with it. He told Detective Barrios that he only remembered doing so once. Before concluding the interview, Detective Barrios asked Aguirre to write L. an apology letter explaining his conduct. Detective Barrios left the room, and Aguirre wrote a letter in which he admitted that he had touched L. inappropriately. At the conclusion of the interview, Detective Barrios arrested Aguirre.

Aguirre testified at trial. On cross-examination, he admitted that he had shown L. his penis at least once. Although he denied touching her with his penis, he testified that he had put it very close to her mouth and vagina. He stated that his penis was not erect while he exposed it to L.

C. *The Charges, Verdict, and Sentence*

The People charged Aguirre with four counts of aggravated sexual assault of a child under 14 years old (Pen. Code, § 269).[3] The People alleged Aguirre committed the

---

[3]    All statutory references are to the Penal Code.

assaults by means of sodomy (§ 269, subd. (a)(3); counts 1 and 4) and oral copulation (§ 269, subd. (a)(4); counts 2 and 3). The People also charged Aguirre with one count of forcible lewd conduct against a child under 14 years old (§ 288, subd. (b)(1); count 5), and two counts of lewd conduct against a child under 14 years old (§ 288, subd. (a); counts 6 and 7).

The jury found Aguirre guilty on counts 6 and 7 (lewd conduct against a minor under 14 years old). The jury found Aguirre not guilty on the remaining charges.[4] Aguirre timely appealed.

## DISCUSSION

### A.  *Aguirre Was Not in Custody When Detective Barrios Questioned Him*

#### 1.    The Interview

On July 12, 2012 Detective Barrios called Aguirre. Detective Barrios said that he knew Aguirre had spoken with a social worker about L.'s case, and that he wanted to discuss the case with Aguirre in person. Detective Barrios did not tell Aguirre that he had to come to the police station.

Aguirre arrived early at the station and met with Detective Barrios, who was dressed in slacks and a buttoned shirt. Aguirre told the detective that he needed to attend a family court hearing, and he asked if he could leave and come back later for the interview. Detective Barrios told Aguirre that he was "free to come and go," and that he could "come back when he was ready." Aguirre left the station to attend the hearing.

---

[4]    During trial, the court granted the People's motion to dismiss count 3.

Aguirre returned to the station several hours later. He met Detective Barrios in the lobby, and they walked together to an interview room. When they arrived, Detective Barrios assured Aguirre that the interview was voluntary and that he was free to leave at any time. Detective Barrios offered Aguirre a glass of water, which Aguirre declined.

The interview room was near a group of offices in the police station. The office had a table and several padded chairs. Aguirre and Detective Barrios sat on opposite sides of the table, and they were the only people in the room. Aguirre was not restrained. At one time the office had a clock and some pictures on the wall, but Detective Barrios did not recall whether they were still in the room at the time of Aguirre's interview. At some point during the interview, Detective Barrios closed the door to the room because there was too much noise coming in from outside.

Detective Barrios did not advise Aguirre that he was under arrest, and he did not read Aguirre his *Miranda* rights. The interview lasted approximately 45 minutes. For the first seven minutes, Aguirre and Detective Barrios talked about Aguirre's background and family, and they discussed L.'s case in general, without going into much detail about Aguirre's involvement.

Aguirre then began talking about L.'s allegations against him. He told Detective Barrios that he bathed L. when she was five or six years old. L. alleged that, after one such occasion, Aguirre touched her genitals and mouth with his penis. Aguirre initially denied this allegation. Later on during the interview, however, Detective Barrios told Aguirre that the police knew everything about the allegations. He then told Aguirre that they were "going to work together to get [the] best results for the children." From that point, Aguirre began explaining what he had done to L.

Aguirre told the detective that on one occasion, when L. was six years old, he tried to explain to her that she should not let other boys or men touch her. He then exposed his penis and placed it in her mouth to "demonstrate" what he meant. Detective Barrios then told Aguirre not to hold back any details about what he had done because investigators could perform a DNA test to confirm whether he had penetrated L. with his penis.

6

Aguirre then told Detective Barrios that he had once put "a little bit" of his penis inside L.'s vagina or her anus, but he could not remember which one.

Toward the end of the interview, Detective Barrios asked Aguirre to write L. a letter of apology. Aguirre agreed, and Detective Barrios left the room to get a pen and paper. He gave Aguirre the pen and paper and again left the room while Aguirre wrote the letter. In the letter, Aguirre apologized to L. for what he had done, although he did not explicitly state that he had exposed his penis or that he had touched her with it.

Aguirre and Detective Barrios discussed Aguirre's conduct with L. for approximately 30 to 35 minutes. At the end of the interview, Detective Barrios placed Aguirre under arrest and read him his *Miranda* rights. Detective Barrios asked Aguirre no additional questions.

2.      The Motion To Suppress

Aguirre moved to suppress the portion of the interview in which he described his conduct with L. He argued that, from the time he admitted that he had engaged in inappropriate conduct with her, he was no longer free to terminate the interview or leave. Aguirre argued that from that point the interview was a custodial interrogation, which required Detective Barrios to inform him of his *Miranda* rights before continuing to question him.

The trial court denied Aguirre's motion. The court found that a reasonable person in Aguirre's situation would not have believed he was in custody at the time he made the statements to Detective Barrios. The court observed that Aguirre came to the police station voluntarily and that, once there, Detective Barrios told him several times that Aguirre was there voluntarily and was free to leave.

The court also noted that the circumstances of the interview would not have led a reasonable person to believe he or she was in custody. The court explained that Aguirre was not restrained, Detective Barrios was the only person in the room with Aguirre, and the detective was dressed in plain clothes rather than in a police uniform. The court concluded: "This court believes the evidence is clear. [Aguirre] was advised that he did

7

not have to stay.  It was clear that he could have left and . . . he did not have to make any statements which would have jeopardized or placed him in threat of being placed in custody.  He chose to make those statements.  I believe he was free to leave the facility entirely . . . and he elected not to do so."

### 3. Applicable Law

Before subjecting a defendant to custodial interrogation, law enforcement officers must advise the defendant of his or her *Miranda* rights.  (*People v. Kopatz* (2015) 61 Cal.4th 62, 80; see *Miranda*, *supra*, 384 U.S. at p. 444.)  The requirements of *Miranda* only apply, however, if the defendant is "in custody" when the officers question the defendant.  (*People v. Tate* (2010) 49 Cal.4th 635, 686.)  Absent a formal arrest, whether the defendant is in custody for purposes of *Miranda* depends on how a reasonable person would understand the circumstances surrounding the questioning.  (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938; *People v. Moore* (2011) 51 Cal.4th 386, 395 (*Moore*).)  The court determines whether under the circumstances a reasonable person would have felt he or she was restrained to the degree associated with a formal arrest.  (*Moore*, *supra*, 51 Cal.4th at p. 395.)

In determining whether a defendant is in custody at the time of questioning, courts consider all of the objective circumstances surrounding the interrogation, including "the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present."  (*Moore*, *supra*, 51 Cal.4th at p. 395.)  While the fact that the questioning occurs in a police station may contribute to a reasonable person's belief that he or she is in custody, that fact alone does not make the questioning custodial.  (*Howes v. Fields* (2012) 565 U.S. __, __ [132 S.Ct. 1181, 1188, 182 L.Ed.2d 17]; *Moore*, *supra*, 51 Cal.4th at p. 402.)  In addition, the fact that the police arrest the defendant after making incriminating statements during an interview at a police station does not necessarily render the pre-arrest interview custodial.  (See *Moore*, *supra*, 51 Cal.4th at pp. 402-404.)  Moreover, whether the officer believed the defendant was a suspect during questioning is not relevant to the issue of whether the

8

interrogation was custodial unless the officer makes the defendant aware of the officer's suspicion. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1401.) Nevertheless, even accusatorial statements or skeptical questions directed toward the defendant, where there are no other indicia of restraint, do not necessarily make the questioning custodial. (*Moore*, *supra*, 51 Cal.4th at p. 402.)

We review a trial court's determination whether a defendant was in custody for *Miranda* purposes as a mixed question of law and fact. (*Moore*, *supra*, 51 Cal.4th at p. 395.) We apply a deferential substantial evidence standard of review to the trial court's factual findings regarding the circumstances surrounding the questions. (*Ibid*.) We independently decide whether, under those circumstances, a reasonable person would have believed he or she was free to stop the questioning and leave. (*Ibid*.)


### 4.      Analysis

Aguirre argues that a reasonable person in his situation would have believed he was in custody and not free to leave the police station. Specifically, he contends that Detective Barrios' expression of suspicion converted the interview from consensual questioning to custodial interrogation. The People argue that the trial court properly denied Aguirre's suppression motion because he was not in custody at any time during the interview. Because Aguirre was not in custody when he made incriminating statements to Detective Barrios, the trial court did not err in denying his motion to suppress.

Before the interview, Detective Barrios asked Aguirre if he would come to the Bell Gardens police station to discuss L.'s case. Detective Barrios never pressured Aguirre into coming to the station. (See *Moore*, *supra*, 51 Cal.4th at p. 402 [defendant voluntarily went to the sheriff's station to give a statement].) When Aguirre arrived at the police station, he met Detective Barrios, who was dressed in plain clothes, in the lobby. Detective Barrios assured Aguirre that he was not under arrest and that he was free to "come and go" as he pleased. Most indicative of the fact that Aguirre was not in custody was that he was allowed to and in fact did leave the police station before the

9

questioning began, and then returned voluntarily several hours later to speak with Detective Barrios. These circumstances strongly suggest that a reasonable person would believe that he or she could leave the police station without speaking to the police, because, among other reasons, that is exactly what Aguirre did. (See, e.g, *Oregon v. Mathiason* (1977) 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (*Mathiason*) [interrogation not custodial where the defendant "came voluntarily to the police station" and "did in fact leave the police station without hindrance"]; *U.S. v. Fleet Management Ltd.* (E.D.Pa. 2008) 2008 WL 1989958, at p. 10 ["the fact that he *did* leave the interview before the questioning concluded certainly supports a finding that he was free to leave at any time"]; *U.S. v. Singh* (D.D.C. 1997) 973 F.Supp. 7, 14 [defendant not in custody during questioning where he "had been told he was free to leave, and he in fact left for lunch only to return on his own accord"].)

The circumstances surrounding Aguirre's return to the police station also show that a reasonable person would have continued to believe he or she was not in custody. Detective Barrios twice reminded Aguirre that he was at the station voluntarily, that he was not under arrest, and that he was free to leave: once after Aguirre returned to the station and again after he and the detective entered the interview room. In addition, Detective Barrios never restrained Aguirre before or during the interview. Aguirre walked unrestrained from the lobby of the station to the interview room, and he remained unrestrained while he spoke with Detective Barrios. Detective Barrios did not arrest Aguirre until the interview was over.

Finally, the circumstances of Aguirre's discussion with Detective Barrios do not suggest a custodial interrogation. There is no evidence that Detective Barrios was ever combative or aggressive. Detective Barrios testified that the interview room was plainly decorated, and it contained a table and several padded chairs. There is no evidence of any restraining devices in the room or that Detective Barrios displayed handcuffs or a weapon. Although at some point Detective Barrios closed the door to the interview room, there is no indication that the door was locked, or, if it was, that Aguirre knew it was locked. Nor was the interview particularly long; it lasted approximately 45 minutes.

10

Aguirre argues that Detective Barrios' statements that he knew what Aguirre had done to L. would have caused a reasonable person to believe he was in custody. As both the United States Supreme Court and the California Supreme Court have recognized, however, an officer's expression of suspicion, without other evidence of restraint, does not render the questioning custodial. (See *Mathiason, supra,* 429 U.S at p. 495, 97 S.Ct. at p. 714, 50 L.Ed.2d 714; *Moore*, *supra*, 51 Cal.4th at p. 403.) In the absence of any evidence that before or during the interview Aguirre was under arrest or otherwise not free to terminate his discussion with Detective Barrios, the detective's expression of suspicion did not render the questioning custodial.

B.      *There Is No Evidence the Support Person's Presence or Conduct Violated Aguirre's Constitutional Rights*

1.      The Support

A support person accompanied L. and her mother when they testified. Before L. testified, the trial court instructed the jury that a victim-witness advocate from the District Attorney's office would accompany her while she testified. The court stated: "When we have a young person or sometimes even an adult, we do have support persons come up because obviously when you have a young person, they may be more nervous than the average adult who may come forward to testify and she may need the assistance during her testimony of the support person . . . ."

L.'s mother, also accompanied by a support person, testified after L. The trial court did not separately instruct the jury that a support person would also accompany L.'s mother. After the court took a recess when L.'s mother began to cry, however, the court told the jury, "Ms. Aguirre is resuming the witness stand and her support person is accompanying her." Later during L.'s mother's testimony, counsel for Aguirre objected to the support person: "I didn't realize until actually Ms. Aguirre became upset and started crying[,] the support person stood up and comforted her because of course the reporter is in the way." The court noted that counsel for Aguirre had not objected to the

11

conduct of the support person at the time the conduct occurred. Counsel for Aguirre responded, "I didn't see her. I am now objecting. I didn't know – she's an adult woman with – I don't know what issues she would need a support person for . . . ." The court overruled Aguirre's objection and stated, "Well, her daughter was an alleged victim of child abuse by her husband and I have observed her crying and I will allow her to have the support person. I don't think it has any negative bearing on your case . . . and I will allow it . . . ."

>    2.    The Applicable Law

Where the charges in a criminal case involve, among other crimes, a violation of section 269 or 288, a prosecuting witness may have up to two support persons of his or her choice during testimony. (§ 868.5, subd. (a).) Only one of the support persons may accompany the witness to the stand. (*Ibid*.) "Prosecuting witness" includes not only the complaining witness, but also all witnesses who testify for the prosecution. (*People v. Adams* (1993) 19 Cal.App.4th 412, 433-434.)

The mere presence of a support person with a witness on the stand does not violate the defendant's due process or confrontation rights. (*People v. Spence* (2012) 212 Cal.App.4th 478, 514, citing *People v. Myles* (2012) 53 Cal.4th 1181, 1214-1215 (*Myles*).) There may be a due process or confrontation clause violation, however, where the support person interferes with the witness' testimony in a way that adversely affects the jury's ability to assess that testimony. (*Spence*, *supra*, 212 Cal.App.4th at p. 514.) For example, emotional displays or gestures, such as placing hands on the witness, may indicate to the jury that the support person believes or endorses the witness' testimony. (*Myles*, *supra*, 53 Cal.4th at pp. 1214-1215; see *People v. Patten* (1992) 9 Cal.App.4th 1718, 1724-1727 (*Patten*).)

In determining whether a support person's presence or conduct implicates a defendant's due process rights, courts look to a number of factors, including the nature of the support person's relationship to the witness, the location of the support person during the witness' testimony, the type of conduct the support person engaged in while the

witness testified, and the type of admonitions given by the court with respect to the witness' use of a support person. (See *Myles*, *supra*, 53 Cal.4th at pp. 1214-1215; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1078-1079, disapproved on another ground in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1370.) In order for the defendant to raise such a due process argument on appeal, the record must clearly identify the support person, where the support person was sitting, and the activities of the support person during the witness' testimony. (*Patten*, *supra*, 9 Cal.App.4th at p. 1733.) The defendant has the burden of demonstrating that the support person's presence or conduct prejudiced his or her rights. (See *Myles*, *supra*, 53 Cal.4th at p. 1215.)

### 3. Analysis

Aguirre argues that he was denied the right to a fair trial and the ability to confront an adverse witness because the support person "physically comforted" L.'s mother during her testimony. He argues that the gesture impermissibly bolstered the credibility of L.'s mother and constituted demeanor evidence he could not confront because the support person was not a witness. The People argue that, because the record does not sufficiently describe what the support person did (if anything), Aguirre cannot argue on appeal that the support person gave L.'s mother improper support.

The only evidence in the record of the support person's conduct is the trial court's statement to the jury that the support person was accompanying L.'s mother back to the witness stand and counsel for Aguirre's statement that the support person "stood up and comforted" L.'s mother. The record does not indicate where the support person was sitting when she comforted L.'s mother (if she did). Nor does the record provide any detail of what kind of support the person provided L.'s mother during her testimony (if any). The support person may have done no more than stand up as L.'s mother paused her testimony and left the stand. And there is nothing in the record showing that the jury saw whatever it was that the support person may have done. Therefore, Aguirre has failed to demonstrate that the conduct of the support person during the testimony of L.'s mother violated his constitutional rights.

C.  *The Trial Court Should Amend the Minute Order and Abstract of Judgment*
    *To Reflect the Oral Pronouncement of Sentence*

At sentencing, the trial court ordered Aguirre to register as a sex offender under section 290, subdivision (c), and to pay a $300 sex offender registration fine under section 290.3.  The minute order from the sentencing hearing requires Aguirre to pay a sex offender registration fine, but it does not require Aguirre to register as a sex offender.  The abstract of judgment does not reflect either order.  The People seek to conform the abstract of judgment to the oral sentence.

In a criminal case, the trial court's oral pronouncement of sentence constitutes the judgment and takes precedence over a subsequent minute order or abstract of judgment.  (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.)  Where the minute order or abstract of judgment deviates from or does not fully reflect the judgment as orally pronounced, the reviewing court should direct the trial court to correct the minute order or abstract of judgment to reflect the oral pronouncement of sentence.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 188.)  Therefore, we direct the trial court to correct both the minute order and the abstract of judgment to reflect the court's oral pronouncement of sentence.

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the January 14, 2014 minute order to require Aguirre to register as a sex offender under section 290, subdivision (c).  The trial court is also directed to correct the abstract of judgment to require Aguirre to register as a sex offender and to pay a $300 sex offender registration

14

fine under section 290.3, and then send a copy of the modified abstract of judgment to the Department of Corrections and Rehabilitation.


SEGAL, J.

We concur:


PERLUSS, P. J.


STROBEL, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.